Well, he wouldn't, he wouldn't give up. No, he wouldn't. Stuck to his guns. As a rational. OK, let me see. This is a defendant's appeal, right? Ready to proceed. Good morning. May it please the court. My name is Dennis Roberts. At council tables, Professor Roston, who worked on the case and the appeal with me. I don't know where to start, to be quite honest. This case basically was stripped of the two crucial defenses we had with Judge White refusing both of those defenses, the feigned accomplice and the entrapment. Now, the entrapment proved a very, very bizarre factor. Essentially, what they stripped you of it, I don't think you really asserted entrapment, did you? Well, that was the problem. The judge problem. How can you strip you of something you don't assert? In fact, the judge said at one point, don't you want an entrapment instruction? No, I don't think he did. What happened, I thought, was that he told us that if we raised entrapment, he would allow the government to raise a 10 to 12 year old predisposition issue and forced me to this kind of grizzly Hobson's choice. Mr. Roberts, he told me several times, what are you going to do? Are you going to raise entrapment? Then, I'm sorry. No, I was just saying, well, yeah, you were presented with a choice, so you had to either raise it or not raise it. So you didn't raise it. I did because what happened is that then suddenly out of nowhere, he told Mr. Nedrow to go ahead and put on the predisposition case. And I somehow opened the door. And at that point, our position was that we should be allowed to argue entrapment. Mr. Nedrow graciously did not do what the judge essentially instructed him to do. Hopefully, I believe, because he thought it was wrong. But for whatever reason, he couldn't do it. Maybe he didn't have the evidence. Anyway, go ahead. I mean, there was a witness waiting in the wings, but that's not on the record. So at that point, the jury then, one of the first questions was, well, what about the entrapment defense? Doesn't entrapment play a role here? And I thought to several of the jury questions that the judge gave very, very confusing and I think almost misleading answers to them. I didn't understand what he was talking about in his answers in trying to explain to the jury. It was basically, well, you know, your role is you're the finders of fact. And that was quite the kind of it. There are, I just want to talk about this some more. There were, you know, many other issues. The whole issue of, it was interesting, the case before us, raising, you know, the weight issue and dovetailing into a frenzy. We have a situation where one co-conspirator is doing a two kilo deal. That's what he's always been told by the informant, that it's a two kilo deal. The two guys who bring him the drugs bring along an extra kilo, but the extra kilo plays no factor. And what I thought would be the same is that these guys had come up from Mexico with 20 kilos and dropped five here and three there. And, you know, and then afterwards they were going to drop three more off. And they just had his two. And yet the judge found, the judge found that it was a three kilo deal. Each kilo wasn't a kilo.  But essentially I think he found 2.7 kilos, which would have made it a three kilo deal. And in our situation it was only two, which would have been less than two kilos. And, of course, that made a very big difference. Now, you know, the whole Rule 11 issue is, I've never seen anything like it in 39 years of practice. What I can only attribute it to the laws practiced differently in New York. But Judge Wexler came out, basically coerced the plea, told Mr. Franchione that, and if you get convicted, I will have a much harsher sentence. The words to that effect. Why isn't that moot at this point? Because Judge Wexler didn't say any more on it and the case was tried. Why are we considering that now? Because I don't think it's proper under Rule 11 for a judge to coerce a plea. And I don't think it's a proper rule. But he withdrew it three years later to the detriment of losing several witnesses. And he could only withdraw it three years later, even though his counsel at the time offered to fly to Brooklyn to deal with the case. The judge said no when he made several aborted attempts to come out to California. He didn't come out for three years, leaving Mr. Franchione hanging, wanting to withdraw his plea because of the coercive element of it. And he couldn't do it. There was no place to withdraw his plea except Brooklyn. And the judge said basically stay out of Brooklyn. So I think it's a very important issue. I still don't see what it has to do with the fact that he was allowed to withdraw his plea and he now went to trial. So we're considering the trial. Okay. I guess it's – I think the Court has to take some kind of notice and some kind of action, even though it didn't impact – well, it does impact the trial. But the Court has to take some kind of action just on the Rule 11 violation. To send a message to district judges across the land, you can't do that. It's not permissible to do what you did. That's one thing. The second thing, of course, is by creating that three-year delay. Now, that advisory opinion that you want us to write would have no effect whatsoever on your case, right? Well, that's probably true, but I was hoping it would. But that – you're right about that aspect, or at least I agree with you on that aspect. But the three-year delay occasioned the loss of, I believe, three separate witnesses. One who died, who was a very important witness because he was the man who was – he was the brother of the snitch, of Mr. Bernardaschi. He was supplying, while a government informant, he was supplying Mr. Francione to keep him in the deal. He was supplying him with cocaine. When Mr. Francione was in that interim period trying to cooperate for his safety valve and was telling the government, look, he's still using coke, he's dealing coke, the government didn't want to hear it. They didn't want to hear that at all. At the trial, Mr. Francione concedes he was using cocaine, and I believe the case agent – I hope I'm not misquoting on this – I believe the case agent at that point conceded that, yes, he was. But when it was pointed out to the case agent by Mr. Francione to earn his safety valve before the plea was withdrawn and everything, it was just not believed. Yet, ultimately, everybody conceded, well, yes, he was certainly using. Now, was there any showing as to what the witnesses that were lost would have testified to? Well, only in the terms of Mr. Francione's uncontradicted testimony. The two witnesses who disappeared, the two gentlemen from south of the border, were there and knew what happened. And if they testified truth – well, let me put it this way. Had they not – had they been part of the case, had they gone to trial three years earlier and I was trial counsel, I would have moved for severance because they could provide crucial evidence as to the abortion of the deal. Mr. Francione – you know, they would have ratified Mr. Francione's position that he said, I don't want to do this. I'm out of this. He started, you know, yelling at these guys, get out of my house. I'm done. He testified to that. He testified to a phone call that he made to Mr. Bernardaschi, stating to him very clearly, don't come over here. I'm not going to do this. The government didn't actually come over. What they did was they aborted – the difference is the deal got aborted. The question then was who aborted the deal. Was it Mr. Francione or was it Mr. Bernardaschi? There was no deal that was consummated in that house. What happened was, from our point of view, Mr. Francione threw these two guys out, said, get out of here. I don't want to do this. They left, and the officers arrested them a considerable distance down the road. And that's – you know, that's how the case went down. So really the issue is Mr. Francione, an admitted liar – I'm sorry, Mr. Bernardaschi, an admitted liar. I did this all the time at the trial court. It was awful. Mr. Bernardaschi. You'll stop me, right, if I do it again. Mr. Bernardaschi was really an admitted liar who was – you know, makes a promise to the government he won't use drugs. Now it comes out in the middle of trial, oh, yeah, he was using drugs. I mean, the man – I think he had three prior cocaine convictions. He was somebody you wouldn't bring home for dinner. I think that's the least we can say about him. And, you know, he has one version, and Mr. Francione has another. Those two witnesses could have and would have, if for no other reason it was in their interest, would have testified that the deal was aborted by Mr. Francione, that they weren't going to sell him three kilos. They certainly weren't interested in testifying. Well, you'll feel a little bit better about having mixed the names up. I'll tell you that I was trying a case once, and I got the witnesses' names infused with my client. And the district judge said, stop, we'll hold everything. Mr. Hugg, I'd like to introduce you to our client. Your judge had a much better sense of humor, I must say, than Judge White, who seemingly was – well, we won't get into Judge White. Other than it is actually a very interesting issue because one of the issues that comes up here is weight entrapment. And, of course, Judge White was very, very knowledgeable in that area after this court told him about weight entrapment, instructed him on weight entrapment. And I think actually that the argument that went before me, not that it's any of my business, but the notion that can you plead reserving that issue, that's exactly what happened in Naranjo. We pled. We just said he didn't intend to purchase five kilograms of cocaine. This court agreed, went back, and the judge made that finding that he did not intend to. But that's their argument, not mine. But it's an awful feeling. And I did it not once. I mean, Professor Blossom would constantly – I was bruised on one side throughout that trial. Now, one of the things that really troubles me about this case is the whole business of the government giving informants, especially this informant, a tape recorder, some tapes, and saying have at it. Now, there's no reason why the government, most of these conversations, as they did on the ones they wanted, couldn't have set him up in a DEA office like they did and had him make the phone call and have the conversations they wanted to have. And they did a few of those. You know, the things that contradict, if you believe the government, contradict Mr. Franchione's position. Mr. Franchione's position essentially was, look, I went along on a program to help my oldest friend, a guy who turned me on to coke and kept me supplied with coke, you know, my entire adult life. It was going to go down for 20 years or life. It was unclear. And I couldn't sit idly by. So what was testified to was there was a time period that Mr. Bernadacci had to kill. That is, his story was he had some big buyers. They were on their way. But the narcotics officers were getting kind of pushy about when he was going to do something. So he put up this straw man to play dope dealer. And Bobby, like a fool, went along with it. But nothing ever happened there. I mean, that went on for a couple of months. If you listen to those tapes, absolutely stupid. I mean, no dope dealer would talk the way Bobby Franchione did, primarily because he wasn't a coke dealer. He was a guy who used to buy ounces, sometimes for himself, sometimes to, you know, divide him up with friends. But he was not any kind of a big-time cocaine dealer. And I think even Mr. Bernadacci concedes, well, I didn't know whether he was or wasn't. Well, isn't this all a jury question? I'm sorry? Isn't this all a jury question? Well, yeah, I think there's a lot that's a jury question, including the finding of weight, which is one of the problems here, the apprendi issues, which is one of the problems here. And, in fact, the apprendi issue was raised, interestingly enough, by the judge at the very beginning of the case. He asked Mr. Nedrow point blank, are we going to have an apprendi issue here? He was very concerned about it. Mr. Nedrow said, no, there's no apprendi issue here. Well, there was an apprendi issue. And that's where there was a beginning of the problems, though, in the very beginning, of course, of prosecution. What was the apprendi issue? The apprendi issue was that evidence which should have been found by a jury wasn't. It was found by the court under a different standard than the jury would have had to find. It wasn't reasonable doubt. It would be unreasonable doubt. It was a preponderance. The judge made that finding about the weight. Let me get back for a second, if I can, to the recording. But it didn't exceed the statutory maximum, right, for the kind of recording? It did in a different way. What happened was the indictment, which was an old indictment because of this delay, and that's why I think the judge raised the question, the indictment said a discernible or detectable amount of cocaine. I wouldn't say more than 2 kilos of the way they now indict. It said a detectable amount. Well, we got some jury questions. The first three jury questions went to that issue. The questions came back, was the cocaine that Mr. Bernardacci and Mr. Francione snorted at the transaction, was that an intent to distribute? And obvious from the question was that they didn't see an intent to distribute anything more than what was ingested. And the reason was because it was going to the police and everybody knew it was going to the police. It wasn't going to go on the street as a marketable cocaine. So at least one juror, we have no idea, despite an interview afterwards, which isn't part of the record. We can't really argue how many jurors or what the issue is. But they said, I think first was the, you know, just a couple of lines. Was that, you know, do we find, you know, can we find it that, or isn't that enough? I mean, it was very confused. The judge, as I say, didn't answer that very clearly. They came back with another question, which I think was that Mr. Bernardacci may have taken a sample, and they wanted to know if that was distribution. They weren't concerned with the two or three kilos, depending on how you read it, because that was going to the government. But after the judge made it very clear that he didn't, they were fine as a fact. He wasn't going to discuss that anymore. And I think he killed them off when he finally told them, entrapment, forget it. That, you know, that's when the jury got a very loud and clear message. But let me just go back, if I may, to the, you know, the Brady issues about the tapes. Here the government turns over tape recorder and says to this guy, one of the most unreliable snitches I've ever run into, go tape. Bring us what you get. Well, we had an expert witness by stipulation who said every one of those tapes was over-recorded. Every one of those tapes had gaps and jumps. You know, we sat there and listened to them. It was a joke. A call would start in the middle. It would, you know, end in the middle. There would be a long gap. Another call would start. I mean, it was such an obvious, handmade erasure. And, you know, the evidence was, I believe there were 90 contacts, based on the phone bills, from Mr. Bernardaschi's house to Mr. Franchione's house and the reverse. I think there were something like 60 or 70 of those calls in this period of time. And then there were, I think, at least 30 person-to-person encounters. He comes up with 10 recordings. He controlled the tapes. He said he really couldn't remember if he, you know, erased some, but he certainly didn't do it intentionally. It was, well, I don't think you can bring in, and we tried to keep out all of the tapes since we could only, since there were only 10 in existence instead of 90 or certainly more than 10. We tried to keep it out. The judge said, no, these, you know, cherry-picked tapes are going to go to the jury. I mean, it was Mr. Bernardaschi's case to run as he chose in so many ways because he controlled so much of the deal. Robert, you've got about a minute left. I'll reserve it then. Thank you very much. Let's take some questions. Please report. Good morning, Your Honors. My name is Jeff Nedrow. I represent the United States in this matter. Your Honors, Robert Francione was a multi-kilogram cocaine dealer in the Monterey area, and this transaction was directed and organized and coordinated by Mr. Francione. And the evidence at trial and in the case demonstrated that completely independently of the informant's uncorroborated testimony. And I particularly want to call the Court's attention to Agent Wright's testimony, which is in the record on the October 24th date between pages 117 to 127, because in that record of Agent Wright's testimony, what he says during his conversations with Mr. Bernardaschi and Mr. Francione, just Agent Wright and Mr. Francione, Mr. Bernardaschi is not present. It's infectious. Excuse me, Your Honor. It is. It is infectious, Your Honor. Absolutely. And I even did it in the brief, and I apologize for that. Agent Wright, speaking alone with Mr. Francione, has a conversation in which Mr. Francione knowledgeably discusses topics such as the quality, purity, and flakiness of cocaine, the going price of cocaine in the Monterey area, and specifically a size of price of $25,000 a kilogram. That's on page 123 of the October 24th transcript. Agent Wright commented on Mr. Francione's relaxed, knowledgeable, and confident demeanor. This is the October 24th transcript, page 122. And furthermore, there was an aspect of this transaction where the DEA wanted to buy a half kilogram of cocaine, because that's the funds they had available, and Mr. Francione said, no, no, I only deal in kilograms, and that's in the record on page 124 on October 24th. Mr. Francione said, I'll have to talk to my source of supply, made a phone call in front of Agent Wright, came back and said, I'm sorry, it's going to have to stay at a kilogram level. And they haggled about it, and no transaction occurred that day, because Agent Wright couldn't get Mr. Francione to sell less than a kilogram of cocaine. What issue does this go to? Your Honor, the reason I'm really raising this strongly right now is on the issue of entrapment. I want to make sure that the Court had confidence. The entrapment issue and the issue that's been raised about the informant, to make sure that the Court understood that there was ample evidence of predisposition in this record for the jury to make the finding it did of guilt. Well, entrapment wasn't raised, was it? Your Honor, entrapment wasn't raised because counsel specifically informed the Court directly on multiple occasions. Your Honor, I am not going to raise entrapment. And before the instructions, and Your Honor, I'm glad you brought that up, because I didn't want to read. So I'm wondering why we have to go into all this about entrapment. Your Honor, fair enough, and I apologize. I don't want to absolutely take the Court's time, because I know it's valuable. The last thing I'll say on entrapment before I move on, though, is I would like to read a quote, because there was a question initially whether the District Court gave counsel the opportunity on entrapment. So I want to make sure the Court had in the supplemental excerpts the Court's statement, I just want to make sure it's clear, and I think you made it clear before, but Mr. Roberts, you are affirmatively not seeking an entrapment instruction for tactical or other reasons, correct? And Mr. Roberts says, for any reason the Court can think of, I am not absolutely underlined not raising that defense. That's what Mr. Roberts said before the closing, before the jury raised the question. Your Honor, thank you for the guidance, and I'll move on to another topic that arose, which was whether or not there is any evidence in the record of exculpatory information lost as a consequence of the three years that passed while Mr. Franchione, for reasons known only to him, decided not to raise this issue regarding the Judge Wexler exchange. Because we need to make it clear that while there is some evidence, I would agree that Mr. Franchione sought to get sentenced during that period of time. He never once raised for over three years anything about this alleged, and I say alleged because I don't think it's ultimately real clear what happened, this conversation between Judge Wexler and his counsel. It was only after the government filed a sentencing memorandum in October of 1999. At that point, Mr. Franchione said, well, you know, I've got a problem with how this guilty plea went down, and now I want out of my guilty plea. And I think the Court's absolutely right that the remedy for that appropriately is the fair trial. Mr. Franchione received before a different judge, Judge White in San Jose. I've lost the witnesses that were lost during this interim of three years. Thank you, Your Honor. I'm glad you raised that. Your Honor, there never was, and District Judge White found this twice, any credible evidence that any of these three witnesses would have provided testimony helpful to Mr. Franchione. And the District Court expressly found that twice based on the lack of evidence in the record. And there's a couple aspects I'd like to address specifically about that. First of all, one point that's important is we'll talk about one of the alleged witnesses, Galvez. The arrest occurred in this case in March of 1996, and the guilty plea occurred in September of 1996. So for months after his arrest, Mr. Franchione had the opportunity, if he had cared to do so, to interview both Mr. Galvez and Mr. Lopez. In fact, Mr. Lopez was not sentenced until April 28, 1997, here in San Francisco, when Judge Wexler returns to handle the sentencing. And that's in the record in the court docket, docket 84, the court can find that. And therefore, Mr. Galvez was around for over a year after he was first arrested. So if, in fact, there was something exculpatory to be had there, Mr. Franchione had ample opportunity to get it. In addition, I'd like to direct the court's attention to the cross-examination on November 1, pages 155 to 158 and 182 to 185, because counsel elucidated Mr. Galvez's statement provided post-arrest to one of the agents. And he elicited the statements in which Mr. Galvez said, yeah, we brought the cocaine in and we took it to the farmer's house. And when I first got here, I didn't know where the farmer's house was. And the purpose appeared to be that he was trying to elicit Mr. Galvez's ownership of the cocaine in furtherance of the defense interest. So it is in the record that he got what he needed from Mr. Galvez in that cross-exam, even given his prior opportunity to interview him. In addition, let's talk about Mr. Lopez for a moment. He fled in August of 1996, specifically August 22, and that's reflected in the supplement on page 5, that again occurred five months after Mr. Francione was arrested. So again, ample opportunity to interview a purportedly exculpatory witness. No evidence ever that Mr. Lopez, the co-conspirator, had anything exculpatory to say. Have they ever found him? They never have found Mr. Lopez. Efforts were made to find Mr. Lopez, but no, he was not found. And it's not clear what happened with him. I do want to briefly mention Mr. William Bernardaschi as well and just say that that's the third witness, and there was never any evidence of exculpatory information there. And frankly, Mr. Bernardaschi passed away after the offense, and what's striking about that really is the manner in which at that point for the first time he became exculpatory all of a sudden in a manner which I think can be argued or viewed as very opportunistic on the part of the defense. Your Honors, regarding the issue that arose of the tapes, I would like to address that because Judge Hugg correctly identified that as an issue that was brought before the jury. And I think what's important on that is to look at the record as a whole and see the hours and hours and hours of cross-examination that occurred of the case agent and of Mr. Bernardaschi on these tapes and these calls. These tapes with purported clicking and problems in them were played before the jury. Stipulations were entered before the jury, giving them a full and fair opportunity to evaluate whether or not they had an impact on the jury's perspective on things. They were also played in the context of about a dozen tapes in which Mr. Francione was taped himself, knowledgeably saying, hey, you know, you guys going to set up the deal? You know, we're going to do two or three kilos of cocaine? And discussing with enthusiasm, interest, and confidence the possibility of a multi-kilogram cocaine transaction. The jury had a full opportunity to hear the tapes. The witnesses were asked about the tapes. Counsel presented a closing which argued the tapes. It was all there for the jury to evaluate, and they returned the finding that they did. And their questions did not reflect confusion, but they simply reflected clarification on making sure, appropriately, that they were applying the elements as instructed by the court regarding the conspiracy to possess cocaine with intent to distribute, which was, in fact, presented to them. Your Honors, I wanted to briefly address the issue as to ‑‑ if I may just have a moment to clarify this. How about the upward adjustment? I'm sorry. Yes, Your Honor. How about the upward adjustment? The upward adjustment for obstruction, Your Honor? Yeah. Well, Your Honor, what I'd like to do, I think Judge Weiss said it best when he summarized his reasoning for that adjustment. He had the opportunity to hear Mr. Francione testify at trial that the only reason for his involvement in this case was to play act the role of a person helping Mr. Bernardaschi in order to help his friend, Mr. Bernardaschi. That happened even though he didn't tell law enforcement after he was arrested that he was trying to help the agents. And after he lied to law enforcement at the time of his arrest, saying, I don't even know Mr. Lopez. He flat‑out said, I don't know Mr. Lopez. And he then had to admit at the stand, yeah, I lied about that. In light of that, he also ‑‑ I wanted to comment on another aspect of his testimony. Was that material? I'm sorry. The fact of whether he knew Lopez or not? Yes, Your Honor. I think it was because Mr. Lopez, the evidence strongly supports circumstantially anyway, was the person who had brought the cocaine to Mr. Francione's house. And there was evidence linking Mr. Francione to Mr. Lopez. And, in fact, after Mr. Bernardaschi at the agent's direction canceled the deal, not Mr. Francione, Mr. Bernardaschi canceled the deal with the agents monitoring him, Mr. Lopez and Mr. Galvez drove away with the cocaine in their car. They were arrested, and they had the actual cocaine. So a denial of knowing that Mr. Lopez, given that Francione knew Lopez had the cocaine, was quite significant to Mr. Francione. Judge White said, I think the story presented at trial was inherently unbelievable, and I found that as it was being given, and I don't think he was set up by some story that he was doing this for the government. He went on to say, I think he falsely testified, and he was not playacting, referring to his role in the scheme. And I think his testimony was false, and he knew it. His testimony doesn't make any sense. And that's in the supplemental excerpts of 271 and 273. He did not make a finding of materiality, did he? Your Honor, he didn't expressly articulate the words materiality. You're right. I agree with that, that he did not say that. Implicitly, huh? Did he implicitly make one? Your Honor, I think it's implicit in that the totality of Mr. Francione's testimony was to deny intent to participate in the scheme. Mr. Francione admitted all the elements of the crime except for an intent to actually do a drug transaction, and given that the totality or the entirety of his testimony was to say, I didn't have that intent, Judge Weiss finding that the testimony in its totality was false, I think, goes ultimately to the critical element of intent, and therefore there is an implicit aspect of materiality there. But I absolutely agree with the Court that he didn't specifically articulate that within a framework of materiality. Your Honors, to summarize, I think that the trial record reflected a full and fair hearing of these issues before a jury. This trial took a month. There were, as the transcript reflects, hours and hours of cross-examination of the case agent and the informant. At the end of the day, the district court did a full and careful job at sentencing, evaluating all of these factors, and took into account the circumstance where the evidence overwhelmingly demonstrated Mr. Francione's predisposition and intent to engage in a multi-kilogram cocaine transaction, and the adjustments in the overall sentence reflected the Court's evaluation of that effect. And if there aren't any further questions, I'll submit it. When the jurors ask specific questions and they weren't answered because the juror came back before that, what should the district court have done? Did they do the right thing in just ignoring them? Well, Your Honor, actually, my recollection was that the critical questions that were brought up by counsel were actually answered prior to the jury coming back with a guilty verdict, and specifically the one that was raised on a definition of distribution and also the question of whether or not entrapment was an issue in this case. Those questions were responded to by the district court before the guilty verdict. And I didn't recall, but I would certainly invite counsel into rebuttal if I could check for a moment. So I do have a little bit of time left to confirm that. But I didn't recall one of the questions. Well, wasn't there one note that Judge Hooks said that was not answered? In other words, during the time that the judge and the plaintiff was counsel trying to figure out what the answer should be, the jury returned a verdict? Didn't that happen? Your Honor, it was definitely not the entrapment question. It was definitely not the other question. There may have been a question regarding the elements that was still pending at the time of the guilty verdict, but I don't recall it being one of the ones raised by counsel. And actually, I don't believe that there was a question. What about on the distribution definition? The court did respond to the distribution definition. The court did respond and basically cited them back to the distribution addition that had previously been given. And I wanted the court to be aware that the district court did, contrary to counsel's claim, that he was not permitted to make the feigned accomplice argument. While it's true that the district court rejected that instruction, I'd call the court's attention to the supplemental excerpts at 193, because I think that instruction really addresses what the defense was in this case. And that was the instruction where the court said, if a person participates in an agreement to transfer a prohibited drug to someone else with an honestly held belief that he's doing so with the approval of law enforcement, he does not have the intent to deliver because he does not intend that the person to whom the transfer is planned is actually going to do other than turn the prohibited drug over to law enforcement. And really, I think that instruction goes above and beyond what was necessary, because, of course, obviously the person wouldn't have the intent if that was the jury's finding. But that was an effort to accommodate counsel's request to have even more focus put on Mr. Franchione's claim that he didn't have the intent to conduct a drug transaction. So actually, Your Honor, as I stand here, I don't recall an instruction that was pending at the time. I may be opposing counsel. Okay. Very well, then. If there are any further questions, then I'll submit this point. And I very much appreciate the court's time. Thank you. All right. Thank you. It's going to be hard to do. First of all, there's absolutely no evidence in the record about Mr. Franchione being a historic multi-kilo dealer. I mean, just there's no – that's what the whole entrapment thing was about, whether some 10- or 12-year-old case which was dismissed, which was an illegal entry and an illegal arrest, if I remember correctly. But was there an unanswered question from the jury? I believe there was. I believe there was. Well, I don't want belief. I want evidence. If you want a transcript cite, I'm not going to be able to help. But my memory, and we just were discussing that, was that the predisposition question was never answered and the two other – I'm sorry, the distribution question was never answered and also the two questions about, well, you know, was it like this little teeny bit, would that be the possession we'd intend to distribute or this little bit bigger amount? Nobody was talking about two kilos. But we don't really know at this point whether there was a note from the jury that was not answered before the jury came back. My belief is that at least one question, distribution question, was – Well, I guess we don't know. We don't know for certain. So we'll have to look it up. Right. And I'll try and look it up when I get home and send in a letter, if that'll help. Okay. Let me talk very quickly. This whole fame, knowledge thing, you know, it strikes me, maybe the Court has never seen, which was decided by Judge Marilyn Patel, where a guy who knows nothing about the cocaine business whatsoever, buys a book, rips the cover off so the stewardess won't know, flies to Ecuador and tries to become a big cocaine dealer. And what gave him away was when he said to them, well, I'll give you my recipe for converting leaf to paste in my Detroit warehouse. And the agents had a lot of trouble keeping a straight face at that point. This is done all the time. I'm not saying that Mr. Franchione didn't know anything about cocaine. Yes, he used cocaine. He was addicted to cocaine. He used it for years, but he wasn't a big-time distributor. There were two separate events in this case, and you have to sort them out. The first event is what I call the stall. Bernadette, she says to Bobby, please, please, just play coke dealer. You know, you're not going to have to do anything. Don't worry about it. Then several months passed. Nothing happens. Several months passed. Then Bernadette, she says to him, look, I know that you know. Mr. Roberts, you can't just launch a new argument. You're a minute and a half over your time. I'm sorry. You've got something that you have to say before you sit down and go ahead, but don't give us a brand-new argument. The only thing I guess I really need to say is the whole business about the destruction of the tapes by the informant I just find to be outrageous. And it wasn't that the jury heard clicks. The jury didn't hear the tapes that weren't there. That was the problem. Thank you very much. All right. Thank you. We thank both counsel. This case is submitted for decision. I'll take a brief recess before we turn for the balance of the calendar. All right. All right. Thank you. Thank you. Thank you.
judges: Hug, B Fletcher, Tashima